Filed 4/13/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>       v.<br><br>DERRICK LEE SLEDGE,<br><br>    Defendant and Appellant. | G048814<br><br>(Super. Ct. No. 98NF2403)<br><br>O P I N I O N |

Appeal from postjudgment orders of the Superior Court of Orange County, Nancy Wieben Stock, Judge. Affirmed.

John L. Dodd, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Warren Williams, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \*

In 1999 defendant and appellant Derrick Lee Sledge was sentenced under the "Three Strikes" law (Pen. Code §§ 667, subds. (b)-(i), 1170.12)[1] to a term of 25 years to life in state prison for crimes he committed in 1998.  After passage of the Three Strikes Reform Act of 2012 (Reform Act), defendant filed a petition to recall that sentence and for resentencing pursuant to section 1170.126.

The court, in its discretion, determined resentencing defendant would pose an unreasonable risk of danger to public safety, and therefore denied both the petition and a subsequent motion for reconsideration.  Defendant contends the court abused its discretion by erroneously failing to consider certain facts and by improperly considering other facts.  We find no abuse of discretion and affirm.

## FACTS AND PROCEDURAL HISTORY

*1.  Defendant's Commitment Offenses*

In 1998, defendant went into a bank and attempted to cash a check for $453.12 drawn on the account of Sara Delgadillo.  Ms. Delgadillo had not signed the check or given defendant permission to cash it.  The bank teller learned the checking account had been flagged, and the branch manager called the police.  Defendant told police he had received the check from a man for whom he had performed some house painting and yard cleaning.

A jury convicted defendant of possession of a fictitious instrument (§ 476), check forgery (§ 470, subd. (a)), and second degree burglary (§§ 459 & 460, subd. (b)).  The court found true the additional allegations defendant had previously suffered three serious or violent convictions, two for residential burglary and one for assault with a deadly weapon.  The court sentenced defendant to a term of 25 years to life.  The judgment was affirmed on appeal.  (*People v. Sledge* (Feb. 27, 2001, D036483) [nonpub. opn.] (*Sledge I*).)

_____

[1] All statutory references are to the Penal Code unless otherwise indicated.

## 2. *Defendant's Prior Offenses*[2]

Apart from his commitment offenses, defendant has a lengthy criminal conviction history. Defendant first entered the criminal justice system in 1979, when he suffered a misdemeanor juvenile adjudication for petty theft (§ 484, subd. (a)) after stealing a pair of pants from a store. He was 16 years old.

In 1980, when defendant was 17 years old, he suffered a felony juvenile adjudication for forcible rape (§ 261, subd. (a)(2)). The victim was a woman in whose home defendant had been placed following the petty theft adjudication. She was awakened by defendant's hand around her neck. He covered her mouth, pulled up her dress and forced intercourse upon her for two or three minutes.

In 1981, when defendant was 18 years old, he was convicted of residential burglary (§§ 459 & 460, subd. (a)). Defendant and two male accomplices entered an occupied residence around 10:30 p.m. Defendant planned to take stereo equipment, but instead took a watch and a wallet and fled after the occupant woke up. He was sentenced to two years in the California Youth Authority (CYA).

In 1983, when defendant was still on parole for the 1981 offense, he was convicted of receiving stolen property (§ 496). Defendant was stopped driving a vehicle with two male passengers. A large quantity of stolen electronic equipment was stacked on the back seat. He was sentenced to two years in prison.

---

[2] Some of these facts are taken from the opinion in *Sledge I*, which is part of the record in this appeal. (*People v. Osuna* (2014) 225 Cal.App.4th 1020, 1027, fn 2.) Others are taken from the record in *Sledge I*, which is not part of the record in this appeal, but is a part of defendant's "criminal conviction history." (§ 1170.126, subd. (f)(1).) We obtained a copy of the record in *Sledge I*, and took judicial notice of it on our own motion. (Evid. Code §§ 452, subd. (d) & 459, subd. (a); *People v. White* (2014) 223 Cal.App.4th 512, 519, fn. 4.) We also gave the parties an opportunity to inspect the record in *Sledge I*, invited them to file supplemental briefs regarding its relevance, and considered their supplemental briefs in deciding this appeal.

In 1985, while still on parole for the 1983 offense, defendant pled no contest to residential burglary (§§ 459 & 460, subd. (a)) and assault with a deadly weapon (§ 245, subd. (a)(1)), and he admitted personal use of a firearm (§ 12022.5). According to the arrest report, defendant entered the victim's residence by prying iron bars from a rear window. When the victims came home and noticed the front door was unlocked, defendant opened the door, pointed a gun at them, and ordered them inside. As they attempted to flee he fired one round over their heads and said he would blow their heads off. Defendant then pulled the victims inside, robbed them, and placed them in a bedroom closet which he nailed shut. Defendant was sentenced to eleven years in prison, was paroled in 1990, and after he violated his parole in 1993 was returned to finish his term.

*3. Defendant's Record of Discipline and Rehabilitation While Incarcerated*

Defendant has a record of minor rules violations in the Orange County jail. These involved using newspaper and books to cover his cell vent, and possession of contraband (extra issue and newspapers) in his cell.

Defendant also has a record of rules violations in state prison. Most were minor, such as delaying lock-up, covering a cell window, and possessing contraband. However, two were more serious and involved violent behavior. The first occurred in 1999, when defendant was involved in a fight with another inmate. They appeared to be exchanging punches, but none of the punches made contact and neither sustained any injuries. Defendant claimed he was defending himself. Even so, he was found guilty of engaging in behavior that could lead to violence, was forfeited 30 days of credits, and was counseled and reprimanded.

The second occurred in 2006, when defendant participated in a prison riot between black and white inmates. Defendant claimed he was not involved in the riot. Nevertheless, he was ultimately found guilty of participating and given a 90-day term in the segregated housing unit.

On the other hand, defendant has a laudable record of education and self-improvement while incarcerated. He has completed more than 70 religious courses, earned an associate arts degree, and completed 11 other educational/vocational courses, including vocational dry cleaning, stress management, language, arts, reading, writing, anger management, job acquisition, and an "Alternative to Violence Project."

Defendant has finished 12 comprehensive sessions of the "Fathers of Children United Stand" self-development program, which included topics like self-control, overcoming fear, positive thinking, functions of leadership, importance of education, self-motivation, critical thinking, and practical life skills. In addition, defendant has completed the "Transcommunality and Peace Studies Class," affiliated with the "Barrios Unidos Prison Project of Santa Cruz, California."

Defendant has been praised for being "an excellent student," having "good work/study habits," and being "a pleasant individual." Supervisors have commended his work. He has been applauded for having an "exceptional" attitude toward supervisors and staff. He has participated in group activities, including playing softball and refereeing tennis, and been admired for his sportsmanship and dedication to his team.

Defendant has also attempted to better those around him and become a leader to his peers. He has taken a course designed to reduce the spread of HIV throughout his prison facility. He was elected by his peers to the position of "Black Representative for F-Wing" where he is "the spokesperson for the entire inmate population at this facility."

4. *Defendant's Mental Health and Substance Abuse History*

Defendant has a well documented history of mental health problems, which date back to his traumatic childhood. These problems have resulted in two suicide attempts during his incarceration. He tried to hang himself in 1999, and he cut his wrists with a razor in 2000.

In 2002, during an annual unit classification committee review, defendant requested single cell housing due to his psychiatric problems. The committee instructed defendant to discuss the issue with his psychiatric practitioner.

In September 2005, during defendant's annual unit classification committee review, the committee noted the psychiatric interdisciplinary treatment team had prescribed defendant a single cell due to his mental health. The committee assigned him to a single cell for 60 days and referred him to psychiatric services.

In November 2005, the interdisciplinary treatment team recommended housing defendant in a single cell as long as he is in the California's Department of Corrections and Rehabilitation (CDCR) system due to chronic mental health problems that are quite resistant to treatment. The unit classification committee reviewed this recommendation and assigned defendant to a single cell for mental health reasons, but only through October 31, 2006.

In 2007, defendant declined to appear before the unit classification committee for his annual review. The committee decided defendant would retain single cell status based on the 2005 recommendation that he remain in a single cell as long as he is in the CDCR system. The committee also noted defendant had been referred to mental health for a reassessment of single cell status.

In August 2011, the mental health interdisciplinary treatment team recommended that defendant remain in a single cell for 12 more months due to his mental health condition.

In January 2012, clinician and psychologist E.W. Hewchuck evaluated defendant's mental health suicide risk. He estimated defendant's chronic risk moderate, and his acute risk low. Hewchuck reported all other mental health indicators were within normal limits, but noted defendant was diagnosed with "Major Depressive Disorder, Recurrent, Severe With Psychotic Features."

In December 2012, Hewchuck again evaluated defendant's mental health. Hewchuck estimated defendant's chronic and acute suicide risk low and noted defendant was then housed in general population. Other than moderate stress and depression and being unable to sleep due to back pain, all of defendant's other mental health factors were within normal limits.

Defendant also has a well documented substance abuse history. He reportedly has been sporadically addicted to cocaine throughout his adult life, not using while incarcerated but quickly returning to it when released into the community.

Defendant's addiction caused his wife to leave him in 1997, and he then "became a full time functional homeless person by choice, and a rock head never to go around my upstanding friends." He had been homeless for approximately a year and was addicted to cocaine at the time of his arrest in this case. He also admitted cocaine use in connection with his 1981 and 1985 convictions.

A letter from Dr. Charles Hinkin, Professor of Psychiatry and Behavioral Sciences at UCLA, filed in support of defendant's motion for reconsideration states if defendant's "drug use arose as an attempt to self-medicate his psychiatric problems, then the successful resolution of his emotional problems removes the reason why he started abusing drugs in the first place. This suggests that he will be less likely to return to drug use should he be released from prison."

Hinkin also notes, "The fact that he has 15 years of sobriety under his belt is of tremendous prognostic favorability. But there is no guarantee. That said, . . . as he gets older the severity of his drug use will decline and the chances that any continuing drug use would result in criminal behavior would concomitantly decrease. . . . The steps he has taken to address his emotional problems and to better himself while in prison, coupled with the epidemiological facts, . . . all converge on the conclusion that [he] has a favorable prognosis for avoiding relapse."

7

*5. Defendant's Petition and the People's Response*

In February 2013, defendant filed his petition for recall of sentence in propria persona. It included a declaration in which he acknowledged his drug problem contributed to his criminal behavior, and expressed regret that his inability to tackle his problems led to a life sentence.

Defendant also declared "I deeply am sorry and regret all the hardship and pain I've caused my family, my past and current victims." And, defendant expressed disappointment with the criminal justice system and regret "that he wasn't given a full and fair opportunity to compel to the courts how he do [*sic*] not fall within the spirit of Calif. 3-Strikes law . . . ."

The petition was supported by voluminous exhibits, including the following records in this case: the complaint and the information; the jury verdict forms; the transcript of the original sentencing hearing; the original and amended abstracts of judgment; the unpublished opinion in *Sledge I*; and records of defendant's education and self-improvement activities while incarcerated.

In May 2013, defendant's appellate counsel filed a separate "motion in support of resentencing pursuant to . . . section 1170.126," which included some of defendant's mental health records while incarcerated.[3]

The district attorney filed a brief in opposition to the petition. It was supported by the presentence and supplemental presentence reports prepared by the Orange County Probation Department in connection with the original sentencing in this case; defendant's "rap" sheet as of 2013; and more of defendant's mental health records while incarcerated.

---

[3] In January 2014, we granted defendant's motion for an order augmenting the record on appeal, and defendant's appellate counsel filed an augmented clerk's transcript consisting of 223 pages of CDCR records, all of which had been produced and considered by the court in ruling on the petition.

*6. The Hearing on Defendant's Petition and the Court's Ruling*

Pursuant to section 1170.126, subdivision (b), the petition was assigned to the same judge who presided over the trial in this case, who heard the evidence of and found true the prior conviction allegations, and who imposed the life sentence defendant now seeks to reduce.

At the outset of the hearing in June 2013, the court identified all of the pleadings, records, and other materials it had reviewed and considered, and indicated preliminarily it would find defendant eligible for resentencing under section 1170.126, subdivision (e).

Both sides then argued their respective positions at length. Neither side disputed the court's preliminary indication it would find defendant eligible for resentencing. In fact, the district attorney actually agreed defendant was "technically eligible for resentencing . . . if the court would to [sic] find that he doesn't pose a substantial risk to public safety . . . ."

After the matter was submitted, the court denied the petition from the bench, finding defendant was eligible to apply for resentencing but posed an unreasonable risk of danger to public safety.[4] On the record the court then gave a detailed explanation of the factual and legal basis for its ruling.

Later that day, the court issued a written minute order setting forth substantially the same detailed explanation, which reads in full as follows:

---

[4] We requested supplemental briefing on the question of whether defendant's forcible rape juvenile adjudication is a "sexually violent offense" which renders him ineligible for resentencing as a matter of law under section 1170.126, subdivision (e)(3). (See §§ 667, subd. (e)(2)(C)(iv)(I) & 1170.12, subd. (c)(2)(C)(iv)(I); and Welf. & Inst. Code, § 6600, subd. (b).) Not surprisingly, the parties take opposite positions on this question. We elect to express no opinion on it, and instead resolve this appeal based only the issues actually contested by the parties and decided by the court below.

"On February 15, 2013, [defendant] filed a Petition for Recall of Sentence (Resentencing) pursuant to . . . section 1170.126(e). The Court has determined that he is statutorily eligible for resentencing relief, due to the nature of this third strike offense. [Defendant's] third strike offense was Uttering a Fictitious Check; Check Forgery and First Degree Commercial Burglary, in violation of . . . Sections 476, 270(a) and 459-460(b), respectively. [Defendant's] strike priors at the time consisted of two First Degree Burglary [*sic*] and an Assault with a Deadly Weapon (Firearm). At the Qualification Hearing held today, the Court considered the Petition for Recall of Sentence, with attachments; the Motion in Support of Resentencing with attachments, and also the District Attorney's Brief re: Sentence Modification. Pursuant to . . . Section 1170.126, with attachments. The Court has also reviewed the CDCR packet subpoenaed to court and consisting of over 200 pages; the mental health evaluations provided by the Public Defender (Motion), the Presentence Report and Supplemental Presentence Report from the original sentencing, and the Transcript of the original sentencing, all of which including [*sic*] evidence of [defendant's] prospects if released, his criminal history and record while I [*sic*] prison.

"After reviewing all of the material referenced above and in consideration of the criteria set forth in . . . section 1170.126(f)(g), the Court concludes that resentencing of this [defendant] would pose an unreasonable risk of danger to public safety.

"There is a brazenness to [defendant's] criminal history that evidences a lack of control over criminal impulses. The violent juvenile conduct including rape; the forcible entry into private residences, the shooting at the heads of fleeing victims and the walking into a bank with a forged check and trying to pull it off with a straight face, all demonstrated a certain hubris and lack of concern for serious, traumatic, if not deadly consequences. Even [defendant's] check-passing victim was particularly violated and fearful by the act.

"In prison [defendant] has been involved in violence of a different sort. His two suicide attempts in 1999 and 2000, by hanging and cutting have evidenced a continuing penchant for the ultimate act of violence, trying to do violence to himself. Then, there are the two documented instances of hand-to-hand violence with other inmates, once in a riot condition and the other in a two-man battle. The Court does not give[] as great of weight to the 2006 riot, understanding that such a circumstance could have, by its very nature, drawn [defendant] into combat of a defensive nature. Also, unlike [defendant's] past acts, there is no evidence of cunning or planning involved on his part. There is also the fact that through many mental health evaluations, [defendant] has been classified for a 'single cell' due to his 'psychiatric problems.' This was the case in 2005 and it was recently confirmed in 2011 for the following year. A [*sic*] stated in the report, this was necessary 'due to the chronic mental health problem [*sic*] that is quite resistant to treatment.'

"Heavy use of multiple types of drugs was what contributed to some of [defendant's] criminal activity while on release. The use of such drugs has been connected in some of the CDCR evaluation reports to the need to mask depression and anxiety for which the [defendant] has been diagnosed. At the time of sentencing in this case, [defendant] had served two prior State Prison terms and a commitment to the [CYA]. For this reason, [defendant's] track record while free, is quite limited, providing little support for the notion that he will be drug-free and thus, crime-free on release. Exacerbating the risk factor is that the period immediately after release, will be parole-free.

"As a further indicator of risk, the records reviewed by the Court do not reveal any instance where the [defendant] has acknowledged responsibility for his criminal acts, including the ones that had a direct impact on crime victims. Thus, a possible indicator of rehabilitation and good prospects on release is not present in this case.

11

"The Court has considered [defendant's] academic and personal accomplishments in prison as indicated by the documentation provided in the Motion. This shows [defendant] has taken advantage of opportunities for college credits and personal improvements, including participation in anger management type programs. However, this is not enough to overcome the factors recited above."

7. *Defendant's Motion for Reconsideration and Notice of Appeal*

In July 2013, defendant filed a motion for reconsideration of the denial of his petition, supported by two expert declarations. The first declaration was from Daniel Vasquez, a corrections expert with over 30 years of experience in the CDCR. Based upon his review of the CDCR records considered by the court, Vasquez opined that defendant has "aged out" of his drug addiction and does not pose a danger to the community if released. The second declaration was from Hinkin and, as noted above, he opined defendant has a favorable prognosis for avoiding relapse.

The district attorney filed opposition.

After a hearing in August 2013, the court denied defendant's motion for reconsideration. The court explained:

"[Defendant], his case presented significant concerning features that I outlined in my order, some of which, frankly, weren't even cited by the district attorney's office. We all have our own views of human nature and public safety, and we all have our own life experiences. And the court has to, at this point, use its own experience as well as the information you all have given to sum up the situation on behalf of the public and determine whether the standard has been met relative to unreasonable risk to public safety.

"My concern with respect to [defendant] is there are indicators that he has lived a very insular and protected life in custody; the consistent status of being essentially deemed to be in such a psychiatric condition that he needs to be isolated from people is something that is not available once he is released.

12

"As to the mental illness issue, I do want to assure counsel that this court has dealt with that issue in this context before. I have ordered second strike sentencing on people who have significant mental illness issues. It's been a hiccup in the process, but it has not been, in my view, a factor that would cause somebody to be denied release if all other factors were in place. Quite frankly, as we all know, if you are not mentally ill when you go in, the process of long-term incarceration with no prospect of release can cause certain mental illness features to surface. So it's just not uncommon to see people with mental illness in this condition.

"A couple of comments. The material presented by Dr. Hinkin relative to mental illness and drug issues. I understand the issues. I don't see anything the court wouldn't have already considered.

"With respect to Mr. Vasquez - assuming this is some kind of request that we convene a hearing for evidentiary purposes or the court recive this for evidentiary purposes - I think Mr. Vasquez's declaration, as opposed to Dr. Hinkin's, probably encroaches upon the court's role. I think the law is clear that the court must evaluate all of the factors that he has evaluated here. So I'm not sure an expert would be called for at a sentencing hearing when we are talking about evaluating somebody's correctional progress.

"That having been said, I didn't see anything in his analysis that would change the court's opinion. And so I'll just defer the issue of whether the court would have stricken his ultimate opinion as inappropriate in a sentencing proceeding, because like I said, I didn't see anything that would have caused the court to revisit or think that I have missed something in the first instance. So the court's tentative would be to respectfully deny the motion for reconsideration on this grounds. Let me turn to the People, if you have any follow-up comments."

Thereafter, defendant filed timely notices of appeal from both the denial of his petition and the denial of his motion for reconsideration.

13

## THE BURDEN OF PROOF AND THE STANDARD OF REVIEW

Under the Reform Act, if the petitioner is statutorily eligible for relief, "the petitioner shall be resentenced . . . unless the court, in its discretion, determines that resentencing the petitioner would pose an unreasonable risk of danger to public safety." (§ 1170.126, subd. (f).) The prosecution has the burden of proving defendant's dangerousness by a preponderance of the evidence. (*People v. Superior Court* (*Kaulick*) (2013) 215 Cal.App.4th 1279, 1301-1305 (*Kaulick*).)

"In exercising its discretion in subdivision (f), [of section 1170.126] the court may consider: [¶] (1) The petitioner's criminal conviction history, including the type of crimes committed, the extent of injury to victims, the length of prior prison commitments, and the remoteness of the crimes; [¶] (2) The petitioner's disciplinary record and record of rehabilitation while incarcerated; and [¶] (3) Any other evidence the court, within its discretion, determines to be relevant in deciding whether a new sentence would result in an unreasonable risk of danger to public safety." (§ 1170.126, subd. (g).)

There is a dispute between the parties about the applicable standard of review. Defendant contends we review the court's dangerousness determination for abuse of discretion, citing *Kaulick*. But *Kaulick* did not say that. The Attorney General argues the court's dangerousness determination need only be supported by "some evidence," also citing *Kaulick*. But *Kaulick* did not say that either.

What the Court of Appeal in *Kaulick* did say is: "A trial court's decision to refuse to resentence a prisoner, based on a finding of dangerousness, is somewhat akin to a decision denying an inmate parole. Such a [parole] decision need only be supported by 'some evidence' . . . . This does not mean that an inmate is otherwise eligible for release [under section 1170.126] but that release can be denied on a finding supported only by 'some evidence.' It simply means that the inmate remains subject to his initial sentence unless certain findings are made; these findings need not be established beyond a reasonable doubt." (*Kaulick*, *supra*, 215 Cal.App.4th at p. 1306, fn. 29.)

14

Several cases decided since *Kaulick* have now clarified that when a court denies relief under section 1170.126 because reducing a petitioner's sentence entails an unreasonable risk of danger to public safety, that discretionary determination is reviewed under the familiar abuse of discretion standard. (See, e.g., *People v. Davis* (2015) 234 Cal.App.4th 1001 (*Davis*.) Using this standard, we consider whether the ruling, "exceeds the bounds of reason or is arbitrary, whimsical or capricious. [Citations.] This standard involves abundant deference to the trial court's rulings." (*People v. Jackson* (2005) 128 Cal.App.4th 1009, 1018.)

Finally, the factual findings upon which a court's unreasonable risk determination is based are themselves subject to review under the equally familiar substantial evidence standard. Thus, we review the entire record in the light most favorable to the court's factual findings to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could make those factual findings by a preponderance of the evidence. (Cf. *People v. Bolin* (1998) 18 Cal.4th 297, 331.) But if the factual findings are not supported by substantial evidence, they cannot form the basis for an unreasonable risk determination. (See *People v. Cluff* (2001) 87 Cal.App.4th 991, 998 [court abuses discretion when factual findings critical to decision find no support in evidence].)

## DISCUSSION

Defendant claims the court's unreasonable risk of danger determination constitutes an abuse of discretion, because the court: (1) improperly failed to consider his most recent housing status; (2) erroneously found he used a firearm in committing the crimes which resulted in the 1985 assault with a deadly weapon conviction; and (3) mistakenly found he never acknowledged responsibility for his crimes. Defendant also maintains the court's reliance on facts contrary to the record was prejudicial. We will consider each of these contentions in turn.

15

*1. The Court Did Not Fail to Consider Defendant's Most Recent Housing Status.*

Defendant first contends the court failed to consider his most recent housing status, did not make an informed decision, and improperly relied on stale information rather than current circumstances. We are not persuaded.

As noted, the court found: "There is also the fact that through many mental health evaluations, [defendant] has been classified for a 'single cell' due to his . . . 'chronic mental health problem that is quite resistant to treatment.'" But nothing in the record suggests the court was unaware of or ignored the fact that defendant's single cell status ended some time in 2012. In fact, the opposite is true. The court reviewed all of the mental health records which contain multiple references to defendant's housing status throughout his incarceration.

Furthermore, defendant mischaracterizes the court's comments on defendant's single cell housing status. The import of those comments was not that defendant was then housed in a single cell. Rather, the significance was that for substantial periods during his incarceration, defendant's mental health problems had necessitated housing him in a single cell. As the court explained:

"My concern with respect to [defendant] is there are indicators that he has lived a very insular and protected life in custody; the consistent status of being essentially deemed to be in such a psychiatric condition that he needs to be isolated from people is something that is not available once he is released."

In short, the court found it had been necessary to house defendant in a single cell at various times due to his mental health, and determined that fact was "relevant in deciding whether a new sentence would result in an unreasonable risk of danger to public safety." (§ 1170.126, subd. (g)(3).) This factual finding is supported by substantial evidence in the record, and this discretionary determination did not exceed the bounds of reason, nor was it arbitrary, whimsical or capricious. Accordingly, the court did not abuse its discretion in this regard.

16

*2. The Court Did Not Erroneously Find Defendant Used a Firearm in Connection With the Crimes Which Resulted in His 1985 Assault with a Deadly Weapon Conviction.*

Defendant next contends the court erred by considering his use of a firearm in connection with the crimes which resulted in his 1985 assault with a deadly weapon and residential burglary convictions, and by finding the 1985 assault with a deadly weapon conviction to be a firearm related offense. We do not agree.

Preliminarily we note, all of these arguments are predicated upon defendant's factual assertion there is no evidence in the record that he used a firearm in committing these crimes, other than the statements of the victims in the 1985 arrest report as summarized in the 1999 presentence report. Defendant is wrong.

During the 1999 trial in this case, a "prior" packet, consisting of the Los Angeles Superior Court records of defendant's 1985 convictions, was marked and introduced into evidence as exhibit 6 (Exhibit 6). At that time the court considered Exhibit 6 and said, "I'm just reviewing the portion on the use of weapon." A minute later, the court stated, "as to the second of the three pled priors [assault with a deadly weapon], *there was actual personal use of gun*." (Italics added.)

Exhibit 6 also included a reporter's transcript of the change of plea hearing in the 1985 case, which reflects the following colloquy:

"[DEPUTY DISTRICT ATTORNEY] MS. COLEMAN: To the charges set forth in Information number A 702862 in Count II, a violation of 245, Penal Code Section 245, subdivision (a), subdivision (l), assault with a deadly weapon with the use of a firearm, [and] Count V, a violation of Penal Code Section 459 in the first degree, residential burglary, how do you now plead?

"THE DEFENDANT: No contest.

"[¶] . . . [¶]

"THE COURT: How about the enhancements?

"MS. COLEMAN: All right.

17

"Mr. Sledge you're pleading no contest to the personal use of a firearm, am I correct, under . . . Section 12022.5?

"THE DEFENDANT: Yes.

"MS. COLEMAN: As relates to Count II?

"THE DEFENDANT: Yes."

Therefore, even ignoring the statements summarized in the presentence report, there is substantial evidence in the record to support the finding that defendant personally used a firearm in committing the 1985 assault with a deadly weapon.

Lastly, defendant asserts the evidence admitted during the 1999 trial, including Exhibit 6, cannot be considered because it was "not before the trial court," and "[i]t was the prosecution's burden to submit whatever evidence it chose in opposing [defendant's] motion." Nonsense. All of the evidence admitted during the 1999 trial was before the court that heard it, and the district attorney was not required to resubmit or refer to it before the court could rely on it. To hold otherwise would be to require the court to ignore the evidence it previously heard, and to deprive the court of its discretion to consider evidence it "determines to be relevant." (§ 1170.126, subd. (g)(3).)

*A. The Court Was Not Limited To Considering Only Crimes and Enhancements for Which Defendant Was Actually Convicted.*

Defendant argues the court was not authorized to consider crimes and enhancements which defendant was charged with but not convicted of, so the court abused its discretion by considering portions of the 1999 presentence report filed in this case. Specifically, he objects to the court's consideration of portions of the presentence report which: (a) summarized the 1985 arrest report stating defendant pointed a gun at the victims and ordered them inside, and when they attempted to flee he fired one round over their heads and said he would blow their heads off; and (b) stated defendant was arrested for residential robbery (former § 213.5).

18

We reject these arguments and objections for several reasons. As for the statements attributed to the victims of the 1985 crimes, it is not clear the court relied on the presentence report summary at all, rather than its own independent recollection of the 1985 prior conviction evidence which was introduced as Exhibit 6 during the 1999 trial. Indeed, during the 1999 sentencing hearing in this case, the court noted, "the fact of the matter is he . . . *committed an aggravated home invasion style, shooting guns, take-over robbery of the most aggravated nature*." (Italics added.)

But even if the court did rely on the presentence report summary rather than its own independent recollection in denying the petition, the court had previously relied on that same summary without objection at the 1999 sentencing hearing. So any objection to the court's reliance on that summary has long since been waived.

As for the presentence report statement that defendant was arrested in 1985 for residential robbery, again it is not clear the court actually relied on it. At any rate, the statement is true. The record indicates defendant was arrested for residential robbery.[5]

Defendant next argues the court was not permitted to consider charged offenses, as distinguished from convictions, because section 1170.126, subdivision (g)(1) authorizes a court to consider the petitioner's criminal conviction history, including the type of crimes committed, the extent of injury to victims, etc., but says nothing about charged offenses. He then invokes the maxim *inclusio unius est exclusio alterius*, and concludes consideration of charged offenses must have been intentionally excluded.

---

[5] According to Exhibit 6, in 1985 defendant was charged with: (1) residential robbery (former § 213.5) with personal use of a firearm (§§ 12022.5 & 1203.06, subd. (a)(1)); (2) assault with a deadly weapon (§ 245, subd. (a)(1)) with personal use of a firearm (§ 12022.5); (3) residential burglary (§§ 459 & 460, subd. (a)) with personal use of a firearm (§§ 12022.5 & 1203.06, subd. (a)(1)); (4) assault with intent to commit forcible rape (§§ 220 & 261, subd. (2)); (5) residential burglary (§§ 459 & 460, subd. (a)); and (6) assault with a deadly weapon (§ 245, subd. (a)(1)) with personal use of a firearm (§ 12022.5).

19

We doubt any exclusion was intentional. Regardless, once more the court is authorized to consider any evidence which "the court, within its discretion, determines to be relevant in deciding whether a new sentence would result in an unreasonable risk of danger to public safety." (§ 1170.126, subd. (g)(3).) That language is certainly broad enough to encompass the charges which led to the 1985 convictions.[6]

Under these circumstances, substantial evidence supports the court's finding the offenses charged in 1985 included residential robbery, and the court did not abuse its discretion by determining those charged offenses were relevant in deciding whether a new sentence would result in an unreasonable risk of danger to public safety.

*B. The Court Did Not Abuse Its Discretion By Considering Statements in the Presentence Report Made By Persons Other Than Defendant.*

Defendant also maintains the court abused its discretion, by considering the statements of the victims in the 1985 arrest report which were summarized in the 1999 presentence report, thereby violating his Sixth Amendment rights. Here he relies on *People v. Williams* (1990) 222 Cal.App.3d 911, 917-918 (*Williams*).

*Williams* is inapposite because it concerned the use of hearsay statements in the context of determining beyond a reasonable doubt whether a prior conviction allegation was true for sentence enhancement purposes under the Three Strikes law. (*Williams*, *supra*, 222 Cal.App.3d at pp. 917-918.) However, the court here was not determining whether to enhance defendant's sentence. Instead, defendant had already received the maximum sentence and petitioned for a grant of lenity. "Any facts found at such a proceeding, such as dangerousness, do not implicate Sixth Amendment issues." (*Kaulick*, *supra*, 215 Cal.App.4th at p. 1305.)

_____

[6] According to Exhibit 6, in 1985 defendant pled no contest to the assault with a deadly weapon and the residential burglary, and defendant admitted the gun use allegation; and in return, the prosecution dismissed all of the other charged offenses, including the residential robbery. The convictions and the dismissed offenses all arose out of the same conduct on the same dates, December 31, 1984, and January 3, 1985.

*Williams* is also factually distinguishable. In *Williams*, the court relied solely on a multiple hearsay statement attributed to the victim in a probation report. The Court of Appeal held, "Because the triple hearsay statement in the probation report was, as the court expressly acknowledged, the only evidence in the record tending to prove personal use of a dangerous weapon, the enhancement finding is not supported by substantial evidence." (*Williams*, *supra*, 222 Cal.App.3d at p. 918.)

In this case, the multiple hearsay statements of the 1985 victims are not the only evidence in the record tending to prove the personal use of the firearm. As we have shown, even ignoring the victim's statements, there is substantial evidence that defendant personally used a firearm in committing the 1985 assault with a deadly weapon. Thus, *Williams* does not apply, and the court did not abuse its discretion by determining those statements were relevant in deciding whether a new sentence would result in an unreasonable risk of danger to public safety. (§ 1170.126, subd. (g)(1), (3).)

*C. The Court Did Not Abuse Its Discretion By Considering the Firearm Related Statements, Even Though Defendant Denied Using a Firearm.*

Defendant also avers the court abused its discretion by considering the statements of the victims in the 1985 arrest report regarding defendant's firearm use, because defendant denied using a firearm. This argument is based on the assertion "it is unknown whether [defendant] was even charged with a firearm use enhancement, and more importantly, even if he was, he did not plead guilty to it." We have already demonstrated this assertion is simply untrue.

What is more, the factual basis for defendant's 1985 no contest plea actually stated he "commit[ted] the crime of assault with a deadly weapon by shooting a revolver at [the victims]" and counsel stipulated to the factual basis for the firearm enhancement. Once again the court did not abuse its discretion by determining this evidence was relevant in deciding whether defendant posed an unreasonable risk of danger to public safety. (§ 1170.126, subd. (g)(1),(3).)

21

*D. The Court Did Not Err By Finding Defendant's 1985 Assault With a Deadly Weapon Conviction Was Firearm Related.*

Defendant next professes the court abused its discretion by erroneously finding he had been convicted of a firearm related offense. We disagree, as noted above. Further, the Court of Appeal opinion in *Sledge I* found his 1985 convictions involved "the use of a gun." (*Sledge I*, *supra*, D036483.) This finding is final and binding for all purposes in this case. (*Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 828-829.) Thus, there was no error.

*3. The Court Did Not Abuse Its Discretion By Finding the Record Did Not Reveal Any Instance Where Defendant Acknowledged His Responsibility for His Crimes.*

Defendant claims the court abused its discretion by erroneously finding the record did not reveal any instance where he acknowledged responsibility for his criminal acts. He points to the court's statement, "the records reviewed by the Court do not reveal any instance where [he] has acknowledged responsibility for his criminal acts, including the ones that had a direct impact on crime victims."

Defendant says the court was mistaken, because he acknowledged his responsibility in the declaration he filed in support of the petition. He quotes parts of his declaration, which we set out more fully for context:

"Petitioner/I acknowledged [sic] that, prior to being arrested, that I had a severe drug abuse problem and expected something more dramatically [sic] would have to occur in order for me to stop. Because I had already lost two careers, abandoned my first marriage with sons, then destroyed a second marriage, and resulted content [sic] being homeless.

"There is no doubt that I was screaming for help when I participated in this criminal activity. And for all the wrong reasons caused me to be dishonest of how I came in possession of the forgery check, when telling the truth would probably have resulted in me being diverted to a drug treatment program.

22

"So, during the last 14 years in prison I have deeply regretted my past inability to tackle my problems, so receiving this 25-years to life in prison, I made a point to transform myself which the attached Exhibits would some what [sic] demonstrate my diligent efforts and dedication for becoming a Born Again Christian.

"Hereford [sic], I deeply am sorry and regret all the hardship and pain I've caused my family, my past and current victims. And upon the $1,000 Restitution imposed, I now only owe $200 dollars through prison jobs labor by only being paid no more than 15 cents an hour from the very limited jobs assignment.

"However, I must express to this court how disappointed that I was unable to convince to the Judiciary System that various factual information (newly discovery) and retroactive laws compels [sic] I should only be/been suffering from one 1985 (count 4) prior burglary strike contrarily [sic] to the three currently strikes. I ask this court to first note that my 1981 (CYA) burglary juvenile adjudication pursuant to Welf. Inst. Code 1731.5 (a). Which I should had [sic] gotten relief under People v. Garcia (1999) 21 Cal.4th 1 and allowed another Romero-Hearing (PC 1385).

"Conjunctively, this petitioner's 1985 prior strikes (#2 and #3) were also under a plea-agreement of a court's 'Consolidated Trial' to been [sic] counted for only one prosecuted case (one-strike case). Also, this second strike of PC 245 (a) (1), (count 2) was deliberately stayed so I would not be harm [sic] by it being stipulated in the record because both it and its PC 12022.5 were being Stayed. No punishment was ever imposed at sentencing (the Sentencing Hearing severe [sic] contradict the Abstract of Judgment). Petitioner's [sic] was lead into believing he was pleading to aiding and abetted (substantiating evidence existed to support this petitioner's never processed or/and fired such gun).

"In addition, both these prior cases were plea-deals induced pursuant to PC 667.5 (b) '5-Years Washout Period.' That he'd fulfilled prior to any new laws to supersede."

23

Taken together, these statements hardly support defendant's contention that he "not only acknowledged responsibility for his criminal acts, he did so unequivocally." Instead, it appears defendant blames all of his criminal acts on his drug problems, and he believes he has been wronged by the criminal justice system. Furthermore, it seems the only thing defendant truly regrets is the life sentence he is now serving. Thus, the court's ruling is not contrary to the declaration.

Defendant also says the court's finding he never acknowledged responsibility for his criminal acts was based in part on a mistaken premise that he had been convicted of a firearm related offense. As discussed *ante*, there was no mistake. The court found defendant had been convicted of a firearm-related offense in 1985, and that finding is supported by substantial evidence.

Moreover, the court considered all the evidence in the record, including his denials in the probation report as summarized at the sentencing hearing, and found defendant never acknowledged responsibility for any of his convictions. This factual finding is also supported by substantial evidence. We agree with the court, "it appears there is a pattern of denial and completely different story as to the significant and very important criminal acts, including the shooting at a residence, the rape issue, and then the current offense."

4. *Even if the Court Did Rely on Facts Contrary to the Record, Defendant Was Not Prejudiced.*

Finally, defendant contends the court's alleged reliance on facts contrary to the record was prejudicial. Once more, we do not agree. Even if the court erred as defendant contends, the error was harmless because it is not reasonably probable he would have achieved a more favorable result absent the error. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) Leaving aside the disputed evidence, the court articulated a number of other legitimate concerns about dangerousness, all of which are supported by substantial evidence in the record.

24

The court observed defendant has a violent criminal history, including two incidents of mutual combat while in prison. The court noted defendant's "lack of control over criminal impulses" as evidenced by the "brazenness" of his criminal history. Additionally, the court considered his two suicide attempts, his sustained pattern of heavy drug use, and his "chronic mental health problem." Plus, the court worried that upon release, he would be "parole free."

These concerns alone support the court's determination defendant poses an unreasonable risk of danger to public safety, and thus the court acted well within its discretion in denying his petition for resentencing. So it is not reasonably probable defendant would have received a more favorable outcome even absent the alleged errors.

5. *Section 1170.18 Does Not Apply to Resentencing Under the Reform Act.*

On November 4, 2014, after oral argument in this case, the voters of the State of California approved the Safe Neighborhoods and Schools Act (Proposition 47). Among other things, Proposition 47 added section 1170.18, subdivision (c) (section 1170.18(c)). Section 1170.18(c) provides: "(c) *As used throughout this Code*, 'unreasonable risk of danger to public safety' means an unreasonable risk that the petitioner will commit a new violent felony within the meaning of clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667." (Italics added.)

As we have discussed at length throughout, the phrase "unreasonable risk of danger to public safety" is also used in section 1170.126, subdivision (f), and is central to the resolution of this appeal. Therefore, we ordered the parties to brief the question of whether the section 1170.18(c) definition applies to this appeal. This question is currently pending before the California Supreme Court. (*People v. Chaney* (2014) 231 Cal.App.4th 1391, review granted February 18, 2015, S223676 [Does the definition of "unreasonable risk of danger to public safety" under section 1170.18(c) apply retroactively to resentencing under section 1170.126]; see also *People v. Valencia* (2014) 232 Cal.App.4th 514, review granted February 18, 2015, S223825.)

Two other cases decided after *Chaney* and *Valencia* also addressed this question, and both declined to retroactively apply the section 1170.18(c) definition of "unreasonable risk of danger to public safety" to resentencing under section 1170.126. (*Davis*, *supra*, 234 Cal.App.4th at p. 1006; *People v. Guzman* (Apr. 2, 2015, G049135) __ Cal.App.4th __ [2015 Cal.App. Lexis 286] (*Guzman*)(maj. opn. of Fybel, J.) [definition under § 1170.18(c) does not apply to resentencing under § 1170.126] (conc. opn. of Aronson, J.) [definition under § 1170.18(c) does apply to resentencing under § 1170.126, but not retroactively].) We agree with *Davis* and *Guzman* on this question. And we too conclude "that the five words 'As used throughout this Code' [citation] were not intended by the voters to hamstring the Three Strikes Reform Act." (*Davis*, *supra*, 234 Cal.App.4th at p 1026.) Accordingly, we decline to apply the section 1170.18(c) definition of "unreasonable risk of danger to public safety" to this appeal.

### DISPOSITION

The judgment is affirmed.


THOMPSON, J.

WE CONCUR:


MOORE, ACTING P. J.


FYBEL, J.

26